**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DORTCH, FIGURES & SONS, INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION 1:18-00213-KD-C** |
| | ) | |
| **CITY OF MOBILE, ALABAMA,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's motion for summary judgment (Docs. 27, 28), Plaintiff's Response (Docs. 36, 37), Defendant's Reply (Doc. 41), and Plaintiff's Sur-Reply (Doc. 42).

**I.    Background**

This case is about a minority-owned company's right to compete in a city's bidding process for federally funded sidewalk projects.  On April 3, 2018, Plaintiff Dortch, Figures & Sons, Inc. (Dortch), an African-American owned company, initiated a four (4) count complaint against Defendant City of Mobile, Alabama (the City) in the Circuit Court of Mobile County, Alabama (02-CV-2018-900847.00), asserting the following claims: Count I - 42 U.S.C. § 1981 made actionable by 42 U.S.C. § 1983; Count II - Title VI of *The Civil Rights Act of 1964*; Count III - Federal Executive Order 11246; and Count IV - violations of the Federal Community Development Block Grant Program (CDBG).  (Doc. 1-1).  On May 4, 2018, the City removed the case to this Court on the basis of federal question jurisdiction.  (Doc. 1).

In the Complaint, Dortch alleges discrimination by the City in the manner through which competitive bids were awarded for sidewalks projects.  (Doc. 1-1).  Dortch asserts that the City discriminated against it during the bidding process because the City would "hold" Dortch's bid on

projects by refusing to open its bids yet opening bids by other companies with the same or less qualifications.  (Id. at 3).  In so doing, the City "would repeatedly state" that Dortch lacked the necessary qualifications (a Municipal & Utilities (MU) or Highways & Streets (HS) major classification requirement) but would accept bids from other Caucasian owned companies which also lacked this requirement.  (Id.)

In response, the City contends: the "bid requirements apply to everyone regardless of race." (Doc. 28 at 12).  The City adds that it had a legitimate non-discriminatory reason for rejecting Dortch's bids and/or not allowing Dortch to bid on projects -- the major classification requirement which Dortch lacked. (Doc. 28 at 13).  The City claims that Dortch cannot establish a prima facie case of racial discrimination because it "was not qualified to bid[,]" as it lacked a major classification license.  (Doc. 28 at 14-15).

As evidenced on summary judgment, Dortch's racial discrimination claim is more nuanced than the City's interpretation.  It is not *whether* the bid requirement technically applies to all bidders, it is whether the City treats all bidders equally and/or enforces that requirement uniformly (*i.e.*, the major classification requirement may always "apply," but Dortch alleges that such has been disregarded or excused for Caucasian-owned companies while strictly enforced against his minority-owned company).  In sum, Dortch's case is two-fold: 1) that the City does not uniformly or equally apply and/or enforce -- to all sidewalk project bidders -- a MU or HS major classification requirement, but instead enforces or applies such requirement in a racially discriminatory manner; and 2) the City's major classification requirement itself violates federal law as it has no practical effect other than to stifle competition in the bidding process for minority-owned entities. (Doc. 37-1 at 8, 13, 15).  In support, Dortch cites instances in which the City either did not allow him to bid

and/or allowed and awarded contracts to Caucasian-owned contractors who lacked the requisite qualifications/requirements (MU or HS major classification).[1]

## II.   Findings of Fact[2]

### A.   The Parties[3]

Plaintiff Dortch, Figures & Sons, Inc. (Dortch) is a Mobile, Alabama minority owned (African-American) company and a licensed general contractor in the State of Alabama. (Doc. 1-1 at 2; Doc. 37-1 (Ex. D); Doc. 28-4; Doc. 35 (Decltn. Figures)).

Defendant the City of Mobile, Alabama (the City) is a municipality organized and operating pursuant to the laws of the State of Alabama. (Doc. 1-1 at 2). The City is the recipient of federal and state funding for transportation related construction projects including curbing and sidewalks along public roadways. (Id.) The City conducts a bidding process for Engineering projects, including sidewalk projects, which include a MU or HS major classification requirement.

### B.   Major Classifications: MU/HS

The City Engineering Department sidewalk projects require that a bidder have an MU or HS major classification. In Alabama, to obtain an MU or HS major classification, a licensed

---

[1] Dortch also references the City's February 2014 disparity study reflecting that in the City's Engineering Department only two (2) contracts were awarded to minority and/or women-owned business between 2010-2012. (Doc. 37-1 at 5 (Doc. 35-5)). However, without more context or foundation, the Court is unable to ascertain the relevance of the study to Dortch's claims of racial discrimination in this case, particularly as there is nothing before the Court indicating that during the 3 year period covered, Dortch bid on any sidewalk projects. (Doc. 41 at 5 at note 7).

[2] The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998–999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

[3] On summary judgment, Dortch appears to raise claims against Engineering Department employee Amberger. (Doc. 37-1 at 18-19). However, Amberger is not a defendant and so any claims Dortch endeavors to assert against a city official, such as Amberger, are simply not before the Court.

general contractor must submit a formal application to the Alabama Licensing Board for General

Contractors ("ALBGC"), which must approve the application.

According to City Engineer Nicholas R. Amberger (Amberger), the Engineering

department has "historically required" contractors who bid on City Engineering sidewalk projects

to possess an MU or HS major classification as well as a general contractor's license. (Doc. 28-9

(Dep. Amberger at 11, 74)).  Section 230-X-.27 of the State of Alabama Licensing Board for

General Contractors Administrative Code defines an MU and HS major classification as follows:

> Highways and Streets: Shall include the construction of roads, streets, guardrails, fences,
> parkways, parking areas, bridges, grading, drainage and all other types incidental thereto.
>
> Municipal and Utility: Shall include clearing, grubbing, paving, curbs, gutters, walks, alleys, driveways, sewer projects, water projects, gas projects, electric projects, telephone projects and work incidental thereto.

According to the City, this requirement is clearly specified within the bid documents and

advertisement for each City Engineering sidewalk project bid.  The major classification

requirement reads as follows:

> Any contractor that desires to bid as a prime contractor must possess a Municipal & utility (MU) or a Highway & Streets (HS) Major Classification per Section 230-X-.27 of the State of Alabama Licensing Board for General Contractors Administrative Code.

The City applies this requirement to ensure sidewalk projects are handled by a general contractor

that is "is adequately qualified" to perform and complete the project.  The City further contends

that it does not consider the size or racial makeup of a bidding entity when reviewing bid

submissions: "[w]e care about the licensures that they hold….we welcome everyone[,]" and "[t]he

more bidders, the better…[w]e want the most there for competitive reasons."  (Doc. 28-9 (Dep.

Amberger at 81, 99-100)).

Dortch contends that the City's major classification requirement is an "anomaly among other city departments." (Doc. 37-1 at 4). Dortch argues the requirement is improper (as not required by City ordinance, State Transportation Department rules, or U.S. Department of Transportation rules), and that such is used by the City to racially discriminate because: "[a]ll state and federal policy manuals require that all contracts utilizing federal funds be awarded on the basis of fair and open competitive negotiations….Not meaningless licensure requirements that have no specific relationship to the project at hand. Those policies encourage open competition and discourage any artificial means utilized to stifle competitiveness and the ability of DBEs to participate in the process." (Id.) Per Dortch, "[t]here is no such requirement of the State Licensing Board that a contractor hold an MU classification in order to serve as the prime contractor on a sidewalk project[]" and instead, the ALBGC rule provides:

> A general contractor may undertake to construct or superintend the construction of any project if 51% or more of the work as measured by the cost falls within the major classification, subclassification or specific subclassification in which the contractor's license.

(Doc. 37-1 at 7-8 (citing Section 230-X-26.1)).

Dortch submitted bids to the City for sidewalk projects even though it lacked an MU or HS major classification. In 2016 and 2017, Dortch submitted applications to the ALBGC for an MU major classification. (Doc. 28-10 (Dep. Figures at 6, 18, 82-83, 118-122, 124); Doc. 37-1 (Ex. E); Doc. 28-6; Doc. 28-7). Dortch has never been issued either an MU or HS major classification. (Id.) Dortch admits that part of the reason the City denied its bids was because it lacks a major classification. (Doc. 28-10 (Dep. R. Figures at 118-124, 131)). However, per Dortch, the MU major classification is composed of sub-licenses for "clearing, grubbing, grading, paving, curbs, gutters, walks, alleys, driveways, sewer projects, water projects, gas projects, electric projects, telephone projects, and work incidental thereto." And Dortch claims that it possesses all of the

sub-licenses required for the MU classification, lacking only the formal MU major classification itself.  (Doc. 28-4 to Doc. 28-7; Doc. 28-10 (Dep. Figures at 119-122); Doc. 35 (Decltn. Figures)). Dortch adds that with just those sublicenses, it has successfully completed sidewalk projects across Alabama (but not the City of Mobile).  Further, Dortch notes that the definition of MU major classification includes an Editor's Note stating: "[p]rime contractors may be assigned classifications from the list of Major Classifications and/or Specialty Construction Classifications…"  (Doc. 37-1 at 8).

## C.    The City Engineering Department sidewalk projects

### 1.    Project 2016-202-22A/B[4]

The City's bid advertisement for a $1.7 million sidewalk repair project states in part:

> Bidders must be licensed Contractors in the State of Alabama pursuant to Sections 34-8-1through 34-8-27 of the Code of Alabama of 1975 as amended, and shall indicate State License Number on outside of bid envelope. Any contractor that desires to bid as a prime contractor must possess a Municipal & Utility (MU) or a Highways & Streets (HS) Major Classification per Section 230-X-.27 of the State of Alabama Licensing Board for General Contractors Administrative Code. The bidder must be on ALDOT's "bidder's list" in effect at the time of the Pre-Bid Conference.

(Doc. 28-1).

Dortch did not officially submit a bid on this project but rather "tried" to bid.  (Doc. 28-10 (Dep. Figures at 128)).  The City told Dortch that it was not permitted to bid due the lack of an MU or HS major classification.  (Id. (Dep. Figures at 131)).  Nevertheless, the City awarded the project to a Caucasian owned company, Harwell & Company, LLC (Harwell), which also lacked an MU or HS major classification at the time. (Doc. 28 at 7; Doc. 28-1; Doc. 28-9 (Dep. Amberger at 67); Doc. 28-11 (Dep. Harwell at 21)).

---

[4] Dortch references this project as 2015-202-04 (Doc. 37-1 at 10-11), but the City and the documents in support (Doc. 28-1) reference it as 2016-202-22A/B.  The latter appears to be correct.

As explanation, the City states that the award to Harwell was a mistake, subsequently corrected in July 2016 after the City became aware of the error.  (Id.)  The City asserts that the Purchasing Department, rather than the Engineering Department, handled this bid, and did so for the first time.  (Doc. 28-9 (Dep. Amberger at 93, 108-109)).  The City references this event as an "outlier."  (Doc. 28 at 11).  Per the City, when it realized that Harwell lacked the major classification, it instructed Harwell to obtain one -- but permitted work to continue.  In July 2016, Harwell obtained a major MU/HS classification license.  (Doc. 28-11 (Dep. Harwell at 21, 26)).

### 2.   Project 2017-3005-18 (2017 CDBG Sidewalks)

The City's bid advertisement stated in pertinent part:

> Bidders must be licensed Contractors in the State of Alabama pursuant to Sections 34-8-1through 34-8-27 of the Code of Alabama of 1975 as amended, and shall indicate State License Number on outside of bid envelope. Any contractor that desires to bid as a prime contractor must possess a Municipal & Utility (MU) or a Highways & Streets (HS) Major Classification per Section 230-X-.27 of the State of Alabama Licensing Board for General Contractors Administrative Code. The bidder must be on ALDOT's "bidder's list" in effect at the time of the Pre-Bid Conference.

(Doc. 28-3).  Dortch contends that it submitted a bid for this project but that the City determined that it lacked the MU or HS major classification license as required by the City's Engineering department and so did not even allow it to submit a bid.  Emails from the City to Dortch confirm such.  (Doc. 35-1; Doc. 42-2; Doc. 35 at 2-3 (Decltn. Figures)).  Dortch contends that the City is not allowed to refuse to accept a bid from a general contractor and that the licensing requirement need only be met upon award of the contract, not "to submit a bid."  (Doc. 35 at 3-4).  It is unclear what company was awarded this project.

### 3.   Brewer related projects

Per Dortch, Caucasian contractor Chris Brewer's company received two (2) sidewalk projects though Brewer lacked an MU major classification.  (Doc. 37-1 at 6; Doc. 35 (Decltn.

Figures at 6); Doc. 37-2 (Brewer related projects)).  First, Dortch cites a 2013 project for which the City awarded a sidewalk contract to Caucasian contractor Chris Brewer, who lacked an MU major classification.  Dortch explains that Brewer was not only allowed to submit a bid, but was also awarded the contract.  (Doc. 37-1 at 6).

Second, Dortch cites a 2015 project which Brewer was hired to complete when the contractor who had been awarded the bid, could not:  per Dortch, "Brewer was handpicked to step in …without the benefit of a bid, or a MU license."  (Doc. 37-1 at 6).  According to the City, however, when the original contractor defaulted, the City 'went back to the bonding company for them to finish the job....they subsequently negotiated with Chris Brewer ….to finish the job." (Doc. 37-2 (Dep. Amberger at 88)).

Dortch fails to indicate whether it bid on these Brewer-related projects.

## III.   <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56(c)(1)-(4) provides as follows:

> **(c) Procedures.**
> **(1) *Supporting Factual Positions*.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2) *Objection That a Fact Is Not Supported by Admissible Evidence*.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3)** *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

**(4)** *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

The movant bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the non-movant fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter….Instead, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998–999 (11th Cir. 1992).

**IV.**   **Standing**

The City contends that Dortch lacks standing because it was not qualified to bid without the major classification (MU or HS).  (Doc. 41 at 7-8).

"To satisfy Article III's case or controversy requirement, a plaintiff must show that: (1) he has suffered injury in fact amounting to the invasion of a legally protected interest that is concrete and particularized and actual or imminent; (2) the injury is fairly traceable to the actions of the defendant; and (3) the injury is likely to be redressed by a favorable decision."  Robertson v. Interactive College of Tech./Interactive Learning Sys., Inc., 743 Fed. Appx. 269, 279 (11th Cir.

9

2018) (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-181 (2000); Hollywood Mobile Estates, Ltd. v. Seminole Tribe of Fla., 641 F.3d 1259, 1265 (11th Cir. 2011)).  The alleged suffered injury is Dortch's inability to compete on equal footing in the City's sidewalk project bidding processes  -- being prevented from submitting bids.  Northeast Fla. Ch. of the Assoc. Gen. Cont. of Am. v. City of Jacksonville, Fla., 508 U.S. 656, 666 (1993).  To establish that it has suffered said injury, Dortch must show its ability and readiness to bid on such contracts and that discrimination prevented it from doing so on an equal basis.  See e.g., Odebrecht Const., Inc. v. Secretary, Fl. Dept. of Transp., 715 F.3d 1268 (11th Cir. 2013) (internal citation omitted) ("[a]s the Supreme Court has recognized in the context of standing to bring an equal protection challenge, "the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract.""…"…therefore, a party...need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis[]").

Genuine issues of material fact exist as to whether the City discriminated against Dortch in the bidding process by refusing to accept its bid and/or non-acceptance of Dortch's bid while accepting a Caucasian-owned company's bid -- *even though both lacked the major classification*. Accordingly, Dortch has standing.

V.     **The Counts**

A.     **Section 1983/1983 & Title VI Racial Discrimination**

At issue are the following City Engineering sidewalk projects: 1) **Project 2016-202-22A/B**; 2) **Project 2017-3005-18**; and 3) **the Brewer related projects**.  Dortch alleges Section

1981/1983[5] and Title VI race discrimination claims related to same.[6]

At the outset, "Section 1983 provides individuals with a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States that are committed under color of state law." *Brown v. City of Huntsville, Ala.,* 608 F.3d 724, 733 n. 12 (11th Cir.2010) (citation omitted).  Title VI "prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1191 (11th Cir. 2007). Specifically, Section 601 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

---

[5] Dorch cites 23 C.F.R. § 635.110(c) and  23 C.F.R. § 635.112(d) claiming: ALDOT and federal regulations prohibit a municipality from refusing to accept a bid, requiring only that the bidding contractor be properly licensed before being awarded a final contract; and "if any provisions of state laws, specifications, regulations, or policies may operate in any manner contrary to federal requirements, including title VI of the Civil Rights Act of 1964, to prevent submission of a bid, or prohibit consideration of a bid submitted by any responsible bidder…Such provisions shall not be applicable to federal aid projects." However, these sections governs highways and bids for federal-aid highway contracts, 23 C.F.R. § 635.101.  Dorch has not explained Title 23's relevance and the Court will not undertake that task for it.

[6] As explained in Webster v. Fulton Cty., Ga., 283 F.3d 1254, 1256-1257 (11th Cir. 2002) (footnotes 3-4 omitted):

> Section 1981 provides that "[a]ll persons ... shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 protects people, and some entities, [ ] from racial discrimination during the making of contracts. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 176–77, 109 S.Ct. 2363, 2372–73, 105 L.Ed.2d 132 (1989) …. Section 1981 is enforceable against a municipality through 42 U.S.C. § 1983.[ ] *See Butts v. County of Volusia,* 222 F.3d 891, 894 (11th Cir.2000) (concluding that Section 1983 is exclusive remedy for enforcement of section 1981 rights against state actors).
> ***
> Disappointed bidders are at the core of Section 1981's protection: Section 1981 is a protection against an entity….declining to make a contract with a party…on account of race….

> Section 1981 "plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship…." Bibb Cty. School Dist. v Dallemand, 2019 WL 1519299 (M.D. Ga. Apr. 8, 2019) (quoting *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 480 (2006). See also Moore v. Grady Mem. Hosp. Corp., 2019 WL 2537992, *3 (11th Cir. Jun. 20, 2019) (discussing Section 1981).

However, as explained in <u>McDuffie v. City of Jacksonville, Fla.</u>, 2015 WL 791141, *8-9

(M.D. Fla. Feb. 25, 2015) (footnote omitted, emphasis added):

> To prevail…a § 1983 plaintiff must establish the defendant, acting under color of
> state law, deprived it of a constitutional right. *Soldal v. Cook Cnty., Ill.,* 506 U.S.
> 56, 60 n. 6, (1992). The Equal Protection Clause of the Fourteenth Amendment
> provides, in pertinent part: "No State shall make or enforce any law which shall ...
> deny to any person within its jurisdiction the equal protection of the laws." U.S.
> Const. amend XIV, § 1. This clause "is essentially a direction that all persons
> similarly situated should be treated alike." *Alamo Rent–A–Car, Inc. v. Sarasota–
> Manatee Airport Auth.,* 825 F.2d 367, 369 (11th Cir.1987)…."To establish an equal
> protection clause violation, a plaintiff must demonstrate that a challenged action
> was motivated by an intent to discriminate." *Elston v. Talladega Cnty. Bd. of Educ.,*
> 997 F.2d 1394, 1406 (11th Cir.1993). "Discriminatory intent may be established by
> evidence of such factors as substantial disparate impact, a history of discriminatory
> official actions, procedural and substantive departures from the norms generally
> followed by the decision-maker, and discriminatory statements in the legislative or
> administrative history of the decision." *Id.*
>                                    ***
> Although **McDuffie does not expressly state whether he is proceeding under a
> disparate impact or disparate treatment theory**, many allegations…indicate
> McDuffie's belief that the City's actions have had a disparate impact on African–
> Americans…..McDuffie, as **a private plaintiff, may not obtain redress for
> disparate impact discrimination under either the Equal Protection Clause or
> Title VI.** Thus, **having found that McDuffie's claims alleging disparate impact
> are not cognizable under the law, the Court next analyzes McDuffie's
> remaining allegations under the disparate treatment framework of the Equal
> Protection Clause and Title VI**.

Likewise, a private right of action exists to enforce Title VI based on claims of intentional

discrimination. <u>Id</u>. (citing *Barnes v. Gorman*, 536 U.S. 181, 185 (2002)). <u>See</u> <u>also</u> *Liese v. Indian*

*River Cnty. Hosp. Dist.,* 701 F.3d 334, 346 (11th Cir.2012) ("private individuals may recover

compensatory damages under Title VI *only* in cases of intentional discrimination[]") (emphasis in

original). <u>But,</u> Title VI does not create a private right of action for a disparate impact claim.

*Alexander v. Sandoval,* 532 U.S. 275, 293 (2001) (there is no private right of action to enforce

disparate-impact regulations promulgated under Title VI).

Thus, any claims by Dortch alleging *disparate impact* under Section 1983 and/or Title VI are not cognizable as a matter of law, and thus, such claims are **DISMISSED**. This leaves for review those allegations which the Court construes as Dortch's Section 1983 and/or Title VI *disparate treatment/intentional discriminati*on claims under the Equal Protection Clause.

Turning now to the substance of Dortch's claims, the same proof and analytical framework applies to claims under Title VI and the Equal Protection Clause analysis. Elston v. Talladega Cnty. Bd. of Educ., 997 F.2d 1394, 1406 n.11 (11th Cir. 1993) ("Title VI itself provides no more protection than the equal protection clause—both provisions bar only intentional discrimination, *see Alexander v. Choate,* 469 U.S. 287, 293, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985)—we will not engage in a separate discussion of the Title VI statutory claims, as such an inquiry would duplicate exactly our equal protection analysis. Our equal protection discussion should be understood as disposing of plaintiffs' Title VI…claims…[]").

To establish municipal liability under § 1983, Dortch must establish a policy or custom behind the deprivation of a federal right. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). A municipality can be liable under Section 1983 "only when the deprivation at issue was undertaken pursuant to city 'custom' or 'policy,' and not simply on the basis of respondeat superior." Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479-1480 (11th Cir. 1991). A plaintiff can recover from a municipality for "acts that are, properly speaking, acts of the municipality -- that is, acts which the municipality has officially sanctioned or ordered." Id. (internal quotations removed). In other words, "'….when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)). A "single illegal act" can form the basis for Section 1983 liability but "only when the challenged act may fairly be

said to represent official policy, such as when that municipal officer possesses final policymaking authority over the relevant subject matter." Scala v. City of Winter Park, 116 F.3d 1396, 1397 (11th Cir. 1997).

To prevail under Section 1983, a plaintiff "must demonstrate that (1) he is similarly situated to others who received more favorable treatment, and (2) his discriminatory treatment was based on some constitutionally protected interest, such as race." *Bryant v. Ruvin*, 477 Fed. Appx. 605, 607 (11th Cir. 2012) (citing *Jones v. Ray*, 279 F.3d 944, 946–947 (11th Cir. 2001)).

The record reveals that it is City Engineering Department policy to require an MU or HS major classification of bidders for its sidewalk projects.  The violation, as framed by Dortch, is that it -- a minority-owned company -- is not treated the same as Caucasian-owned companies in the bidding process, as the major classification requirement is not enforced equally.  In support, Dortch references similarly situated companies (Harwell and Brewer), that were not required to have an MU or HS but were allowed to bid and awarded contracts.

The City explains that in the case of Harwell, it was simply a mistake.  But Harwell's owner testified that anyone with the City checking his license number (which was required to be submitted for approval pre-bid) would have seen that he lacked an MU major classification prior to the award.  (Doc. 37-1 at 5-6 (citing Doc. 37-4 (Dep. Harwell at 62-63)).

As to Brewer, the City explains that for the 2015 project they did not select Brewer to finish the sidewalk project, rather a bonding company did.  However, the City has not addressed why they allowed a substitute contractor who did not meet the qualifications.

Taken in a light most favorable to Dortch, the Court finds sufficient evidence "suggesting that the winning bidders did not have to comply with the same bid requirements…" McDuffie v. City of Jacksonville, Fla., 625 Fed. Appx. 521, 524 (11th Cir. 2015)  (footnote omitted) ("*See Love*

*v. DeCarlo Homes, Inc.,* 482 F.2d 613, 615 (5th Cir.1973) [ ] ('Racial discrimination normally involves treating, in similar circumstances, a member or members of one race different from the manner in which members of another race are treated[]').").

For these reasons, the City's summary judgment as to Dortch's Section 1983 equal protection and Title VI claims is **DENIED.**

## B. <u>Count II: CDBG Program</u>

In Count Two, Dortch alleges that the City's racial discrimination resulted in violations of the requirements of the CDBG because the sidewalk projects were funded through same, which is covered by Title VI.  (Doc. 1-1 at 6).  <u>See</u> 42 U.S.C. § 5301 *et seq*.  Dortch further alleges that "Section 36 of the *Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments (Common Rule)*" includes requirements to maximize the use of small, minority and female-owned businesses in procurement and contracting where federal funds or assistance are utilized.  However, Dortch contends that over the last two years and longer, the City failed or refused to adhere to the requirements in the use and expenditure of the CDBG funds damaging Dortch's business interests.

Based on its allegations, it appears that Dortch is referencing "OMB Circular A-102: Grants and Cooperative Agreements with State and Local Governments (10/07/1994) (further amended 08/29/1997),"[7] which contains the following statement:

> d. **Contracting With Small and Minority Firms, Women's Business Enterprises and Labor Surplus Area Firms.** It is national policy to award a fair share of contracts to small and minority business firms. Grantees shall take similar appropriate affirmative action to support of women's enterprises and are encouraged to procure goods and services from labor surplus areas.

---

[7] Office of Management and Budget Circular A-102, "Grants and Cooperative Agreements with State and Local Governments." The recompilation consists of the last complete revision of the Circular published at 59 FR 52224 (dated October 7, 1994, published October 14, 1994), as further amended at 62 FR 45934 (August 29, 1997).

42 U.S.C. Section 5309(a), "Nondiscrimination in programs and activities," provides in part: "[n]o person in the United States shall on the ground of race, color, national origin, religion, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under this chapter[.]"  Section 5305 lists 25 types of activities that may be funded by CDBG money (loans or grants to public or private non-profit entities for acquisition, construction, repair or planning [42 U.S.C. § 5305(a)(14)]; assistance to neighborhood-based non-profit organizations, etc.).  Cities receiving CDBG funds "have wide latitude for choosing specific programs that meet the statute's objectives." *Latinos Unidos de Chelsea en Accion v. Secretary of Housing and Urban Development*, 799 F.2d 774, 776 (1st Cir. 1986).

The consequences of noncompliance are addressed in Sections 5309(b)-(c) as follows:

**(b) Compliance procedures available to Secretary**
Whenever the Secretary determines that a State or unit of general local government which is a recipient of assistance under this chapter has failed to comply with subsection (a) or (e) or an applicable regulation, he shall notify the Governor of such State or the chief executive officer of such unit of local government of the noncompliance and shall request the Governor or the chief executive officer to secure compliance. If within a reasonable period of time, not to exceed sixty days, the Governor or the chief executive officer fails or refuses to secure compliance, the Secretary is authorized to (1) refer the matter to the Attorney General with a recommendation that an appropriate civil action be instituted; (2) exercise the powers and functions provided by Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d); (3) exercise the powers and functions provided for in section 5311(a) of this title; or (4) take such other action as may be provided by law.

**(c) Civil action by Attorney General**
When a matter is referred to the Attorney General pursuant to subsection (b), or whenever he has reason to believe that a State government or unit of general local government is engaged in a pattern or practice in violation of the provisions of this section, the Attorney General may bring a civil action in any appropriate United States district court for such relief as may be appropriate, including injunctive relief.

Section 5311 provides further details for noncompliance, stating in part that:

**(a) Notice and hearing; termination, reduction, or limitation of payments by Secretary**

If the Secretary finds after reasonable notice and opportunity for hearing that a recipient of assistance under this chapter has failed to comply substantially with any provision of this chapter, the Secretary, until he is satisfied that there is no longer any such failure to comply, shall--

**(1)** terminate payments to the recipient under this chapter, or

**(2)** reduce payments to the recipient under this chapter by an amount equal to the amount of such payments which were not expended in accordance with this chapter, or

**(3)** limit the availability of payments under this chapter to programs, projects, or activities not affected by such failure to comply.

**(b) Referral of matters to Attorney General; institution of civil action by Attorney General**

**(1)** In lieu of, or in addition to, any action authorized by subsection (a), the Secretary may, if he has reason to believe that a recipient has failed to comply substantially with any provision of this chapter, refer the matter to the Attorney General of the United States with a recommendation that an appropriate civil action be instituted.

***

**(c) Petition for review of action of Secretary in Court of Appeals; filing of record of proceedings in court by Secretary; affirmance, etc., of findings of Secretary; exclusiveness of jurisdiction of court; review by Supreme Court on writ of certiorari or certification**

**(1)** Any recipient which receives notice under subsection (a) of the termination, reduction, or limitation of payments under this chapter may, within sixty days after receiving such notice, file with the United States Court of Appeals for the circuit in which such State is located, or in the United States Court of Appeals for the District of Columbia, a petition for review of the Secretary's action. The petitioner shall forthwith transmit copies of the petition to the Secretary and the Attorney General of the United States, who shall represent the Secretary in the litigation.

***

Essentially, as framed by Dortch, Dortch's application/bid on the City's sidewalk construction projects is an application for CDBG funds to be distributed by the City.   In claiming that it was wrongfully denied the bids/projects, Dortch bases its CDBG race discrimination claim on Section 5309(a) "Nondiscrimination in programs and activities."  See *supra*.  However, there is no private right under Section 5309 to bring a race discrimination action against city officials for an unsuccessful CBDG application.  See, e.g., Freeman v. Fahey, 374 F.3d 663 (8th Cir. 2004)) (applicant for CDBG funds sued city officials alleging the denial of her applications violated anti-

17

discrimination laws of the Housing and Community Development Act (HCA)).  "Congress did not intend that section 5309 provide a private right of action."  Id. at 666.  As further explained in Latinos Unidos De Chelsea En Accion (Lucha) v. Secretary of Housing and Urban Dev., 799 F.2d 774, 776 and 794-795 (1ˢᵗ Cir. 1986) (civil rights action filed against city and HUD officials, alleging defendants deprived city's minority population of equal opportunities in employment, housing, and government contracts via federally funded programs):

> Chelsea received…federal grants…under…(CBDG)…[ a]…program[]…part of Title I of the Housing and Community Development Act…
>
> … the CDBG…program[] ha[s] nondiscrimination requirements. Recipients….under a specific provision of the HCDA, are prohibited from discriminating on the basis of race, color, national origin or sex. 42 U.S.C. § 5309. CDBG grantees also are required to certify "that the program will be conducted and administered in conformity" with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq…..Title VI prohibits recipients of federal funds from discriminating on the basis of race, color or national origin in the use of those funds; …. The Secretary is charged with making an annual review of the CDBG recipient's programs to determine compliance with applicable laws, and may impose conditions on a present year's grants as a result of the review of a prior year's program. 24 C.F.R. § 570.910(b) (April 1979).
> ***
> …in considering both the legislative history and the statutory enforcement scheme as a whole, see Cort, 422 U.S. at 78, 95 S.Ct. at 2088, the available evidence indicates that Congress did not intend to create a mini-Civil Rights law, with its own private right of action, within the HCDA…
>
> We thus suspect that Congress expected that Titles VI…would provide the primary obligations with regard to nondiscrimination, and that the main purpose of section 5309(a) was the practical one of specifying HUD's role, under the HCDA, in enforcing the requirement that federal fund recipients not discriminate. We note, moreover, that denying a private right of action under HCDA's nondiscrimination provision does little to limit an individual's ability to challenge discriminatory practices; as in this case, Titles VI …. may still be used to challenge any action of discrimination by recipients of HCDA funds.
>
> The fourth Cort factor, whether the cause of action is one "traditionally relegated to state law", 422 U.S. at 78, 95 S.Ct. at 2088, is not applicable with respect to a federal housing statute. In light of our conclusions as to the first three Cort factors, therefore, we hold that Congress did not intend to create a private right of action

under the HCDA. *Cf. Montgomery Improvement Association v. HUD, 645 F.2d 291, 295–97 (5th Cir.1981).*

Moreover, as noted in US ex. rel Anti-Discrimination Ctr. of Metro NY, Inc. v. Westchester Cty. N.Y., 2012 WL 13777, *3 at n.4 (S.D.N.Y. Jan. 4, 2012):

> A HUD referral to the Attorney General to initiate an enforcement action of that part of the HCDA which pertains to CDBG grants is the exclusive means of enforcement. *See* 42 U.S.C. §§ 5304(b)(2), 5311; *accord Greater New Orleans Fair Housing Action Ctr. v. United States Dep't of Housing and Urban Dev., 723 F.Supp.2d 14, 24–26 (D.D.C.2010).* A plaintiff seeking to enforce a statute through either an implied right of action or § 1983 must first demonstrate that "Congress *intended to establish a federal right." Gonzaga v. Doe, 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002).* "[T]he question whether Congress intended to create a private right of action is definitively answered in the negative where a statute by its terms grants no private rights to any identifiable class. For a statute to create such private rights, its text must be phrased in terms of the persons benefited." *Id.* at 283–84 (citation omitted). The HCDA provision governing AFFH certifications to HUD for CDBG grants, 42 U.S.C. § 5304(b)(2), is not phrased in terms of a beneficiary class. Rather, it sets forth terms under which a grantee may receive funding from HUD.

See also *e.g., Sandoval,* 532 U.S. at 288-289 (providing that where a statute is "phrased as a directive to federal agencies engaged in the distribution of federal funds ... [t]here [is] far less reason to infer a private remedy in favor of individual persons[]"); Nabke v. U.S. Department of Housing and Urban Dev., *520 F. Supp. 5, 8-10 (W.D. MI. 1981)(*no private remedy against the city for alleged discrimination related to a CDBG home repair loan program).  In  summary,  nothing in the statute establishes a private right of action for Dortch against the City for CDBG violations, but instead, provides for specific steps and procedures through which other agency entities (versus private individuals/persons) may enforce compliance and/or remedy noncompliance.   Thus, Dortch's CDBG claim (Count II) is **DISMISSED.**

C.   **Count IV: Executive Order 11246**[8]

In Count Four, Dortch alleges that that the City violated Executive Order 11246 by discriminating against it based on race with regard to the bidding process.  (Doc. 1-1 at 6). Executive Order 11246 addresses nondiscrimination in government employment and provides: "[i]t is the policy of the Government of the United States to provide equal opportunity in Federal employment for all qualified persons, to prohibit discrimination in employment because of race, creed, color, or national origin, and to promote the full realization of equal employment opportunity through a positive, continuing program in each executive department and agency." 30 FR 12319, Exec. Order No. 11246, 1965 WL 98356 (Pres.).

As explained in Roscoe v. Aetna Cas. and Sur. Co., 1988 WL 214511, *1 (N.D. Ala. Nov. 8, 1988) (discussing Executive Order 11246 and Title VII and the Equal Pay Act discrimination):

> …[the] complaint alleges discriminatory denial of employment opportunity….non-compliance with Executive Order 11246 … [which] provides in pertinent part:
>
> The contractor will not discriminate against an *employee* or applicant for employment because of race, color, religion, sex, or national origin....
>
> 42 U.S.C.A. § 2000e App. at 19–24 (1982) (emphasis supplied)….Executive Order No. 11246 ….requires a showing of employee status. Furthermore, the Fifth Circuit and the District Court for the Middle District of Alabama have held that Executive Order No. 11246 does not create a private cause of action. *See Farkas v. Texas Instruments, Inc.,* [1 EPD ¶ 9777] 375 F.2d 629, 635 (5th Cir.1976); and *Terry v. Northrop Worldwide Aircraft Services, Inc.,* 628 F.Supp. 212, 217 (M.D.Ala.1980).

And per Hamilton v. Sikorsky Aircraft Corp., 760 Fed. Appx. 872, 879-880 (11th Cir. 2019) (affirming the trial court's grant of summary judgment on plaintiff's Executive Order 11246 breach of contract claim):

> That leaves Hamilton's argument that Sikorsky breached its contract with the United States under Executive Order 11246 by discriminating….against her….

---

[8] Mislabeled by Plaintiff as an *additional* Count III in the complaint.  (Doc. 1-1 at 6).

"[C]ourts have repeatedly held that executive order 11246 does not create a private cause of action for employees to enforce the equal opportunity clause in their employers' government contracts." Eatmon v. Bristol Steel & Iron Works, Inc., 769 F.2d 1503, 1515 (11th Cir. 1985) (collecting cases). We decline Hamilton's invitation to recognize such an action now.

Also as noted in Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1532 (M.D. Fla. 1991) (ruling in favor of defendants on summary judgment):

Plaintiff asserts that liability may be imposed for violation of the anti-discrimination provisions of Executive Order No. 11246 ….The Court rejects these theories of liability. In Banks v. Jacksonville Shipyards, Inc., Case No. 88–128–Civ–J–16 (M.D.Fla. July 7, 1988), Judge Moore of this Court dismissed claims asserting these theories of liability. His decision is highly persuasive, for it rests on a sound legal foundation. In Farkas v. Texas Instruments, Inc., 375 F.2d 629, 633 (5th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967), the appellate court found no private cause of action under the predecessor order to Executive Order No. 11246. Farkas is binding precedent, and its continuing validity received a boost from dictum in Eatmon v. Bristol Steel & Iron Works, Inc., 769 F.2d 1503, 1515 (11th Cir.1985), that states that no private cause of action is available under Executive Order No. 11246. These cases seem to settle the issue, but if this precedent is not in fact dispositive, the Court adopts the analysis finding no private cause of action which appears in Utley v. Varian Assocs., 811 F.2d 1279, 1284–86 (9th Cir.), cert. denied, 484 U.S. 824, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987). Accord Women's Equity Action League v. Cavazos, 906 F.2d 742, 750 (D.C.Cir.1990). ….

See e.g., Cohen v. Illinois Inst. of Tech., 524 F.2d 818 (7th Cir. 1975) (plaintiff had no cause of action for sex discrimination under Executive Order 11246); Banks v. Jacksonville Shipyards, Inc., 1988 WL 235865, *2 (M.D. Fla. July 7, 1988) ("[b]ecause of the absence of any indication that Executive Order No. 11246 was intended to provide a private civil remedy, all of the circuit courts which have been presented with this issue have held that a private cause of action to enforce Executive Order No. 11246 does not exist.…In dicta, the United States Court of Appeals for the Eleventh Circuit likewise stated, '[w]e doubt [appellees] have a private cause of action under the executive order [No. 11246]....' Eatmon v. Bristol Steel & Iron Works, Inc., 769 F.2d 1503, 1515 [38 FEP Cases 1364] (11th Cir. 1985)….. this well-settled law precludes Banks from maintaining

a private right of action under the provisions of <u>Executive Order No. 11246</u>[]"); <u>Henderson v. Corrections Corp. of Am.</u>, 918 F. Supp. 204, 209 (E.D. Tenn. 1996) (finding no independent private cause of action under same); <u>Flora v. Moore</u>, 461 F. Supp. 1104, 1115 (N.D. Miss. 1978) ("Executive Order 11246…does not create a private cause of action as a permissible method of enforcing the anti-discrimination provisions contained therein[]"). <u>See</u> <u>generally</u> <u>Fuller v. Edwin B. Stimpson Co., Inc.</u>, 598 Fed. Appx. 652, 653-654 (11th Cir. 2015) and <u>Fuller v. Edwin B. Stimpson Co., Inc.</u>, 971 F.Supp.2d 1146, 1175-1176 (S.D. Fla. 2013) (discussing same).

There is no independent private cause of action available to Dortch under Executive Order 11246.  Thus, Dortch's Executive Order 11246 claim (Count IV) is **DISMISSED.**

**V.     Conclusion**

Accordingly, it is **ORDERED** that the City's motion for summary judgment (Docs. 27, 28) is **DENIED** as to Dortch's Section 1983 and Title VI claims.  It is further **ORDERED** that Counts II and Count IV are **DISMISSED.**

**DONE** and **ORDERED** this the **22nd** day of **October 2019.**

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DUBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**